UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| RICKIE SLAUGHTER,<br><br>  Plaintiff<br><br>v.<br><br>SHANE ESCAMILLA, et. al.,<br><br>  Defendants | Case No.: 3:16-cv-00457-MMD-WGC<br><br>**Report & Recommendation of<br>United States Magistrate Judge**<br><br>Re: ECF No. 107 |

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment (ECF Nos. 107, 108, 108-1 to 108-7, 109, 110.) Plaintiff filed a response. (ECF No. 117.) Defendants filed a reply. (ECF No. 119.)

After a thorough review, it is recommended that Defendants' motion be denied except that it should be granted insofar as Plaintiff seeks to recover damages against Defendants in their official capacities.

**I. BACKGROUND**

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC) and was housed at Ely State Prison (ESP) at the time he filed his complaint, but has since been transferred to an out-of-state facility in Arizona. He is proceeding pro se with this action under

42 U.S.C. § 1983. Defendants are Shane Escamilla, Sandra Rose[1], Melissa Travis and Stephen Mollet. (Second Amended Complaint (SAC), ECF No. 49.)

Plaintiff asserts the following claims: (1) In Counts I and II, claims for retaliation and conspiracy against defendants Escamilla and Rose based on allegations that these ESP law library employees withheld his legal copy work in retaliation for filing grievances against them in October 2015; (2) In Count III: (a) a retaliation claim against Rose for allegedly confiscating Plaintiff's legal documents and refusing to process his copy work request in May of 2016 in retaliation for filing a grievance against her; (b) a retaliation claim against Travis based on allegations that she denied his grievance regarding Rose's conduct and threatened if he pursued it further or filed additional grievances she would bring disciplinary charges against him and he would loose access to the law library's services; (c) a conspiracy claim against Rose and Travis based on those allegations;  (d) a retaliation claim against Rose alleging that she deprived him of physical access to the law library at ESP in June of 2017, and also July 3, 5, 18, 20, 2017, because of the lawsuit Plaintiff had filed against Rose; (3) In Count IV: (a) a retaliation claim against Mollet based on allegations that he deprived him of his bedding and mattress for a day for filing grievances against him; (b) a retaliation claim against Travis based on allegations that Travis was responsible for Plaintiff's transfer to Arizona and did so because of his lawsuits and grievances against ESP officers, and specifically because Travis was named a defendant in this lawsuit; and (c) a conspiracy claim against Mollet and Travis related to his transfer to Arizona.

Defendants move for summary judgment, arguing Defendants did not retaliate against Plaintiff or conspire to violate his rights, and they are entitled to qualified immunity.

---

[1] She is named as Sandra Rose in the complaint, but appeared as Sandra Rose-Thayer. To be consistent with Plaintiff's allegations, the court will refer to her here as Rose.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

**A. Retaliation and Conspiracy Standards**

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of five elements:

> (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)).

"The most fundamental of the constitutional protections that prisoners retain are the First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts for '[w]ithout those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices.'" *Entler v. Gregoire,* 872 F.3d 1031, 1039 (9th Cir. 2017) (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005)).

To prevail on a claim for conspiracy to violate one's constitutional rights under 42 U.S.C. § 1983, the plaintiff must show specific facts to support the existence of the claimed conspiracy. *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 626 (9th Cir. 1988). The elements of such a claim are: (1) an agreement or meeting of the minds to violate constitutional rights, and (2) an actual deprivation of those rights resulting from the alleged conspiracy. *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002); *see also Hart v. Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but

5

each participant must at least share the common objective of the conspiracy." *Franklin*, 312 F.3d at 4441 (internal quotation marks and citation omitted).

**B. Counts I and II**

Again, Counts I and II allege retaliation and conspiracy claims against Escamilla and Rose based on the withholding of his legal copy work in retaliation for filing grievances against them.

According to Plaintiff, in October 2015[2], he submitted a legal copy work request form along with an envelope containing several grievance documents and exhibits for copying. (ECF No. 117 at 18.) The next day, Escamilla arrived at Plaintiff's cell with the envelope and copy work. Plaintiff's SAC alleges that Plaintiff asked Escamilla if he (Escamilla) could verify the copy work was accounted for and complete, which he avers was required by ESP policy. He claims that Escamilla said: "It's a bunch of grievances. I'm not counting them." Plaintiff avers that he told Escamilla it had to be verified as complete before Plaintiff could sign and acknowledge as much. Plaintiff told Escamilla he would file a grievance against him if he did not verify the copy work. Escamilla responded that he was sick of prisoners like Plaintiff writing grievances, that because Plaintiff was going to file a grievance against him, he would not return Plaintiff's copy work

Plaintiff's declaration contains a different version of events. Plaintiff states that instead of Plaintiff asking Escamilla to account for and verify the copy work, Plaintiff asked if he (Plaintiff) could verify the copy work as complete before he signed for it. Escamilla looked inside and said: "It's a bunch of grievances. I'm not counting them." Plaintiff states that he told Escamilla that if

---

[2] Plaintiff's declaration states August 2015, but both the SAC and supporting exhibits reflect that the correct date is October of 2015.

1  he refused to allow Plaintiff to verify the copy work, he was going to file a grievance against
2  Escamilla. As with the SAC, Escamilla responded that he was sick of prisoners like Plaintiff
3  writing grievances, that because Plaintiff was going to file a grievance against him, he would not
4  return Plaintiff's copy work. Plaintiff's declaration maintains that he never refused the copy work.
5  (Pl. Decl., ECF No. 117 at 6-7 ¶¶ 2-5.)

6  Plaintiff's cellmate, Aaron Daniels, witnessed this interaction. Daniels states that Plaintiff
7  asked Escamilla "can he count the copies to make sure everything was there and correct before
8  he signed the form," and Escamilla said, "It looks like a bunch of grievances" and he was not
9  going to count it. Daniels corroborates that Escamilla told Plaintiff he was sick of inmates
10 writing grievances, and then refused to give Plaintiff his copy work because Plaintiff was going
11 to file a grievance against him. (Daniels Decl., ECF No. 117 at 21-22.)

12 Escamilla continued to refuse to give Plaintiff the copy work, so Plaintiff filed an inmate
13 request form (known as a "kite") to Escamilla's law library supervisor, Rose, about Escamilla's
14 conduct. Plaintiff alleges that Rose responded by conspiring with Escamilla to fabricate a
15 response that it was Plaintiff who had refused the papers. (ECF No. 117 at 19.) The response
16 states: "I have your copy work that you refused. It has been noted you refused to return the
17 original signed copy request form indicated you received. Anytime you have a discrepancy with
18 your copy work kite the law library supervisor and I will make it right." (*Id.*) Plaintiff states that
19 he filed a grievance about this, and sent another kite to Rose asking for his papers back,
20 maintaining that he did not refuse to sign the form. The kite states that he simply requested to
21 verify that all paperwork was present and accounted for. (ECF No. 117 at 24.) Rose refused and
22 failed to correct Escamilla's conduct. He eventually got the paperwork from Rose's supervisor.
23 (Pl's Decl., ECF No. 117 at 7-8 ¶¶ 9-13.)

Defendants do not dispute that Escamilla brought Plaintiff's legal copy work to his cell on October 16, 2015. The SAC alleges Plaintiff demanded Escamilla verify the work as being complete before Plaintiff signed for the copy work, and Defendants do not dispute that Escamilla refused. They contend this was appropriate because ESP Law Library Operating Procedure (OP) 714 states that before receiving copies, the inmate must sign the request form. If there is a problem or discrepancy with the copies after receipt, they are to be first addressed through the law library supervisor through a kite, and if not resolved, through the grievance procedures. The OP does not require the officer to verify the contents. (ECF No. 108-1 at 6.)

They acknowledge that Plaintiff submitted a kite to have the copy work returned after he refused to sign the form, and he subsequently received his copy work. (ECF No. 108-2 at 2 (October 19, 2015 kite), ECF No. 108-3 at 2 (October 23, 2015 memo stating legal copy work documents returned and signed by Plaintiff, but Plaintiff wrote in that he did not refuse on October 20, 2015).)

Defendants argue that Plaintiff's retaliation claim fails because there was no adverse action: Escamilla was not required to verify the copy work, instead the OP required Plaintiff to verify it, and if dissatisfied, submit a kite. Since Plaintiff did not sign for and verify the copy work, it was reasonable for Escamilla to decline to deliver the copy work. The originals were returned, and he signed for them, on October 26, 2015.

As for Rose's involvement, Rose asserts that she responded to Plaintiff's kites and explained that the copy work was not withheld, and was returned as soon as Plaintiff signed for it.

As was mentioned above, Plaintiff's version of events has changed from his SAC to his response to Defendants' motion. In the SAC, he alleges that Escamilla refused to verify that the

copy work was complete. OP 714 clearly requires *the inmate* to verify the copy work is complete and sign as such when the copy work is delivered. It does not require *the officer* delivering the copy work to do so. In response to Defendants' motion, Plaintiff now alleges that Escamilla refused to let *Plaintiff* verify and count the copy work himself, acknowledging that this is what is required by OP 714.

This raises an obvious issue as to Plaintiff's credibility, but it is not the court's province to resolve credibility issues in determining a motion for summary judgment. Therefore, the court must determine whether Plaintiff has presented evidence with his opposition that raises a genuine dispute of material fact as to the retaliation and conspiracy claims in Counts I and II. Taking the evidence in the light most favorable to Plaintiff, Escamilla came to Plaintiff's cell with his copy work and asked Escamilla if he (Plaintiff) could verify it was accounted before and Escamilla refused to allow him to do so. Then, Plaintiff said he would file a grievance and Escamilla said that he was tired of inmates filing grievances and so he would not return the copy work. Plaintiff's cellmate corroborates that Escamilla said this to Plaintiff. Plaintiff advised Rose of this and maintained that he did not refuse to sign the for the copy work, yet Rose refused to have Escamilla return the copy work. Plaintiff's kite to Rose stated that he simply requested to verify that all the paperwork was accounted for, which could be viewed as consistent with the version of events he presents in his declaration.

Plaintiff presents evidence sufficient to create a genuine dispute of material fact as to whether Escamilla and Rose retaliated and conspired against him by refusing to return the copy work after Plaintiff threatened to and did file a grievance. It is for the jury to make credibility determinations as to each party's version of events. Therefore, Defendants' motion for summary judgment should be denied as to Counts I and II.

**C. Count III**

      **1. Deprivation of Papers and Copy Work in 2016**

Plaintiff asserts a retaliation claim against Rose for allegedly confiscating his legal documents and refusing to process his copy work request in May of 2016 for filing grievances against her; a retaliation claim against Travis based on allegations she denied his grievance regarding Rose's conduct and threatened that if he pursued the grievance further or filed additional grievances she would bring disciplinary charges against him and he would lose his access to the law library's services; and a conspiracy claim against Rose and Travis based on those allegations.

Plaintiff asserts that his grievance about Escamilla and Rose's conduct in 2015 was being investigated, and that Escamilla and Rose were informed of this, and they had been interviewed. (Pl. Decl., ECF No. 117 at 8 ¶ 14, 9 ¶ 16.) Then, on May 8, 2016, Rose confiscated and refused to return Plaintiff's legal documents, and refused to process his request for photocopies of these documents. Plaintiff asked another ESP law library employee, Erikson, why Rose had not returned his papers or copy work, and he told Plaintiff to send her a kite. He later found out from inmate law clerk Donald Taylor that Rose confiscated his legal copy work in retaliation for his filing grievances against her. Taylor states in a declaration that Rose confiscated numerous legal papers belonging to Plaintiff during this time period. Taylor overheard Rose state to Erikson that because Plaintiff and some other inmates had filed grievances against her, she was going to find any reason she could to deny their request to the law library. He asked Rose what she meant, and she said that if Plaintiff was going to file grievances to get her in trouble that she was going to find ways to cause him trouble too. (Taylor Decl., ECF No. 117 at 26-27.)

Plaintiff sent a kite to Rose on May 15, 2016, regarding the photocopy request made on May 8, 2016, and that Erikson had informed him that Rose confiscated them. He asked for them to be returned, and that they included declarations of other inmates related to his challenge to a notice of charges and retaliation in lawsuits. He advised that if they were not returned he would be forced to file a lawsuit. (ECF No. 117 at 29.) He claims that Rose fabricated a reason for confiscating the papers: that he refused the documents and that they did not belong to Plaintiff. Plaintiff did not include a copy of the memorandum Rose sent in response, but it is included in Defendants' filing. It states that the law library officer came to his cell on May 16, 2016 to deliver his legal copy request, and he refused to sign for the documents to get them back. The documents were put in a file waiting for him to request them back. It went on to state that Plaintiff could not be in possession of or to copy another inmate's documents, noting there were documents related to inmates Daniels, Stewart and Hendrix in his request. (ECF No. 108-4 at 2.)

Plaintiff states that he then spoke to Erikson again, who told Plaintiff that Rose was mad at him for filing grievances against her. Plaintiff sent Rose a kite on May 25, 2016, telling her that she did not have authority to keep the legal papers. (ECF No. 117 at 30.) He stated that he had permission to use the declarations of the other inmates. (*Id.*) Rose responded and asked Plaintiff to provide written approval for Plaintiff to be in possession of another inmate's original documents and then they would be returned. She also stated that she did not deny his other documents, but Plaintiff refused to sign for them when the officer was at his door to deliver them. (*Id.*)

Plaintiff sent Rose another kite on May 31, 2016, requesting the return of the papers. On June 1, 2016, Rose responded and said she had re-read the legal papers and decided to return them and she would approve his photocopy request if it was resubmitted. (ECF No. 117 at 31.)

1  He received some of the documents back, but Plaintiff claims a declaration by inmate Anthony
2  Stewart was missing. (Pl. Decl., ECF No. 117 at 8 - ¶¶ 15-23; ECF No. 117 at 29-30.)
3       Plaintiff filed a grievance regarding Rose's conduct, and Caseworker Travis came to
4  Plaintiff's cell with the response. The SAC alleges that Travis told Plaintiff that if he pursued the
5  grievance or filed additional grievances she would bring disciplinary charges against him and he
6  would be denied access to the law library's services. Plaintiff's declaration states that Travis
7  threatened him to drop the grievance or he would be barred from all law library services.
8  (Pl. Decl., ECF No. 117 at 10-11 ¶ 25.) Plaintiff also points out that ESP's OP 714, states that if
9  there are any perceived violations of copy work rules, the copy work is to be returned to the
10 inmate unprocessed, but Rose attempted to keep the documents. (ECF No. 108-1 at 6.)
11      Defendants contend that on May 18, 2016, Rose sent Plaintiff a memorandum indicating
12 she was withholding a portion of his legal copy work because it had legal work that he was
13 unauthorized to possess as he appeared to be attempting to improperly copy another inmate's
14 legal work. The copy work at issue contained declarations and grievances from other inmates.
15 (ECF No. 108-4; Rose Decl., ECF No. 108 at 3 ¶¶ 23, 24.) When Rose realized Plaintiff may
16 have been allowed to have these documents, she had the paperwork returned. (ECF No. 108-5;
17 Rose Decl., ECF No. 108 at 3 ¶¶.) She states that she has not withheld legal copy work from
18 Plaintiff based on the existence of this lawsuit or because of grievances. (Rose Decl., ECF No.
19 108 at 5.)
20      There are genuine disputes of material facts with respect to the retaliation and conspiracy
21 claims asserted against Rose and Travis. Defendants maintain that Rose withheld the copy work
22 because he refused to sign for them and she initially thought it contained declarations from other
23 inmates that Plaintiff was not allowed to possess, and returned it when she discovered her

mistake. Plaintiff presents evidence—his declaration and the declaration of inmate Taylor—that Rose admitted to confiscating Plaintiff's documents because he had filed grievances against her. Plaintiff also presents evidence that he informed Rose initially of the reason why the copy work request contained declarations of other inmates, and she still refused to return the documents. He also maintains he never refused to sign for the copy work. Plaintiff also presents evidence that Travis threatened to limit his law library access if he did not drop his grievance against Rose. Therefore, Defendants' motion for summary judgment should be denied as to these claims in Count III against Rose and Travis.

**2. Deprivation of Physical Access to the Law Library**

Plaintiff alleges a retaliation claim against Rose based on allegations that she denied him physical access to the law library in June and July of 2017, because he had named her in a lawsuit.

Plaintiff states that he submitted a form requesting law library access on June 4, 2012 (a Sunday), asking for access on Monday June 12, 2017, and Wednesday June 14, 2017. On June 27, 2017 (a Tuesday), he submitted another request for law library access for access on July 3 and 5, 2017 (a Monday and Wednesday), but was again told Rose denied his request. He completed another law library access request on Tuesday July 11, 2017, for access on July 17 and 19, 2017 (a Monday and Wednesday), but was once again told Rose had denied his request. On July 25 and 27, 2017, Rose allowed him law library access. Plaintiff asserts that all of his forms were submitted, consistent with prison policy, before noon. Rose told him that she felt Plaintiff was not supposed to be allowed to attend ESP law library or be in her presence because he had filed a lawsuit against her. Rose was aware of his lawsuit against her during this time

period as service had been accepted on her behalf in May of 2017. (Pl. Decl., ECF No. 117 at 26-33.)

According to Defendants, the law library supervisor must approve an inmate's request for physical access to ESP's law library. The inmate must submit a request for law library access the Wednesday before they desire to access the law library. OP 714 states that the request must be submitted to the unit control officer no later than 12:00 noon each Wednesday. (ECF No. 108-1 at 3.)

Rose states in her declaration that Plaintiff submitted a request for law library access received on Wednesday, July 12, 2017, and was denied law library access the following week (July 18 and 20, 2017). He was permitted access for the week after that week that was denied, on July 25 and 27, 2017. Rose states that the request was received by her after noon on Wednesday, and so it was denied for the next week but allowed for the following week. (ECF No. 108-7 at 2; Rose Decl., ECF No. 108 at 4.) She maintains she has never denied him access to the law library based on the existence of this lawsuit. (*Id.*)

Rose does not address the other requests for library access that Plaintiff claims she denied. Plaintiff presents evidence—the timing of Rose appearing in this lawsuit, and her comments that she was not supposed to let him in the library with her because of his lawsuit—that raises a genuine dispute of material fact as to the retaliation claim against Rose in Count III. Additionally, Plaintiff disputes Rose's statement that his request on July 12 was not timely submitted. Therefore, the motion should be denied as to this claim.

**D. Count IV**

    **1. Bedding and Mattress**

Plaintiff asserts a retaliation claim against Mollet based on allegations that Mollet deprived Plaintiff of his bedding and mattress for filing grievances against him. Specifically, Plaintiff claims that Mollet arrived to tell Plaintiff he was being transferred to an out-of-state prison facility and he needed to pack up his property. Mollet then took Plaintiff's property, including his bedding and mattress, and told Plaintiff the transfer would take place in two days. Plaintiff requested bedding, but Mollet refused, stating: "Remember those grievances that you wrote against me?" Plaintiff was forced to sleep on the steel bedframe in an extremely cold cell for two days until he was transferred. (Pl. Decl., ECF No. 117 at 12-13 ¶¶ 34, 35, 37.)

Inmate X'Zavione Taylor was a witness to Mollet's conduct. Taylor corroborates Plaintiff's version of events. (Taylor Decl., ECF No. 117 at 33-34.)

Defendants state that they have not been able to find any kites from Plaintiff complaining about this event. Mollet states in his declaration that he does not recall making any statements to Plaintiff. He believes he inventoried inmate property that day, but is not aware of any inmate being required to live for two days without bedding or a mattress prior to transfer. (Mollet Decl., ECF No. 109.)

There is a genuine dispute of material fact as to whether Mollet denied Plaintiff of his bedding and mattress for two days for filing grievances against Plaintiff. While Mollet does not recall doing so, Plaintiff submits his own declaration as well as that of Taylor supporting Plaintiff's claim that Mollet retaliated against Plaintiff. Therefore, Defendants' motion should be denied as to this retaliation claim against Mollet in Count IV.

**2. Transfer to Arizona**

Plaintiff asserts retaliation and conspiracy claims against Mollet and Travis based on allegations that Plaintiff was transferred to Arizona because of his lawsuits and grievances.

Plaintiff alleges that when he asked Mollet why he was being transferred, Mollet told him it was because he had a lot of lawsuits and grievances. When Plaintiff asked Mollet again about the criteria for transfer, Mollet said: "grievance writers and high ranking gang members." Mollet told Plaintiff it was his caseworkers, CERT officers and ESP wardens who were responsible for putting Plaintiff's name in the selection pool. At that time, Travis was Plaintiff's caseworker, and she was the subject of several of Plaintiff's grievances, and had been named in this lawsuit approximately two and a half months prior.  Mollet was a CERT officer. Plaintiff asserts that the actual criteria for transfer stated that non-Nevada residents were supposed to be chosen for transfer. Plaintiff is a Nevada resident, and is not a high-ranking gang member. (Pl. Decl., ECF No. 117 at 12-13 ¶¶ 34, 38, 39, 40-46, ECF NO. 117 at 38.) The criteria actually states that NDOC is to assign offenders based on "prioritizing non-Nevada residents…before considering Nevada residents" who are male, over 18, housed in a cell, classified for segregation or other, and may be part of a security threat group or other. (ECF No. 117 at 38.)

Again, inmate Taylor corroborates Plaintiff's version of events. (ECF No. 117 at 33-34.)

Plaintiff also submits a form where Travis is listed as the person who authorized Plaintiff to be listed for transfer. (ECF NO. 117 at 36.)

Defendants provide a declaration from Nancy Flores, formerly an NDOC classification and planning specialist. She was tasked with compiling a list of inmates to be transferred to the facility in Arizona from NDOC facilities. She reviewed the unredacted list of potential inmate transfers to Arizona from ESP (ECF No. 95-1) and Plaintiff was not included on the list. She

16

cannot confirm or deny that the inmate list was the list of recommended inmates to be transferred to Arizona. She does not remember ESP requesting that Plaintiff be sent to Arizona. If ESP did not suggest that Plaintiff be added to the Arizona transfer list, he would have been added to the list when she ran an internal search to add inmates to the list to fill slots for inmates that had to be stricken from the list. (Flores Decl., ECF No. 110.) She does not explain why this would have been the case.

Mollet's declaration states he does not recall making any statements to Plaintiff, and does not remember specifically escorting Plaintiff to a bus for his transport to Arizona. (Mollet Decl., ECF No. 109.)

Defendants have also provided a declaration of Dwayne Deal under seal with the criteria used by NDOC to select inmates for transfer. (ECF No. 87, 87-1.) The criteria lists various factors that were apparently considered in determining which inmates were sent to Arizona, but does not explain how Plaintiff became a part of this list.

Defendants argue that Plaintiff's only evidence is Mollet's alleged statements, which they argue are unsupported hearsay inadmissible at trial. Mollet is an opposing party in this lawsuit; therefore, the statements Plaintiff attributes to him are not hearsay. Fed. R. Evid. 801(d)(2).

Plaintiff has raised a genuine dispute of material fact—through his declaration and the statements he attributes to Mollet, the timing of the transfer when compared to when Travis was brought into this case, and the document referencing Travis in connection with the transfer—as to the retaliation and conspiracy claims against Mollet and Travis related to Plaintiff's transfer to Arizona. While Defendants are dismissive of the document listing Travis' name, it is titled "Offender Care in Placement" and appears to list the Arizona facility and says has the date of November 28, 2017, and says "Transfer-May be moved at any time" and lists Travis' as

authorizing the transfer. This is sufficient to raise a genuine dispute of material fact as to Travis' involvement.

Therefore, Defendants' motion for summary judgment should be denied as to these claims.

### E. Qualified Immunity

Defendants argue they are entitled to qualified immunity because their actions were taken in accordance with existing prison procedures, and because Plaintiff cannot show it was clearly established that it was unconstitutional to transfer Plaintiff based on the criteria outlined by Deal.

The Ninth Circuit has held that it was clearly established that there is a constitutional right to pursue grievances or civil litigation and an inmate cannot be retaliated against for pursuing these rights. *Entler v. Gregoire*, 872 F.3d 1031, 1041-42 (9th Cir. 2017). Taking the evidence in the light most favorable to Plaintiff, Defendants retaliated and conspired against him because of his grievances and litigation. Therefore, Defendants' motion should be denied insofar as they assert they are entitled to qualified immunity.

### F. Official Capacity

Defendants argue that Plaintiff cannot sue Defendants in their official capacities for damages. Defendants are correct; therefore, Defendants' motion should be granted only insofar as Plaintiff seeks to recover damages against them in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159 (1985); *Bank of Lake Tahoe v. Bank of Am.*, 318 F>3d 914, 918 (9th Cir. 2003)).

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Defendants' motion for summary judgment, except that the motion should be granted insofar as Plaintiff seeks to recover damages against Defendants in their official capacities.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: October 1, 2019

_William G. Cobb_
William G. Cobb
United States Magistrate Judge